Judge Ewing
delivered the Opinion of the Court.
A fieri facias issued from the office of the clerk of the Union Circuit Court, in favor of Ben Tobin against Thomas Hagan, for five hundred dollars, with interest from the 27th day of June, 1823, and costs, and was levied by the Sheriff of Union county, on a negro woman and child.
Leonard Hagan, claiming the slaves as his property, and desiring to have a jury summoned to try his right, *265 in conjunction with Thomas Hagan, executed bond for their delivery at the court house in Morganfield on a day fixed — it being court day. The sheriff, after the day, returned the execution to the office, with his estimate of the value of the slaves, amounting to $400, endorsed thereon, accompanied by the delivery bond, with a statement that the slaves had not been delivered according to the condition thereof.
Whereupon, another fi.fa. was sued out on the bond, against Thomas and Leonard Hagan, for the whole amount of the judgment, including interest and costs, which then amounted to nearly $1000, and was levied on the land of Leonard Hagan. He filed his bill against Ben Tobin and Thomas Hagan, to be relieved from, the execution and delivery bond.
He charges that the slaves were his property when seized by the sheriff, and that he entered into the bond for their delivery at the day of sale, with the understanding that the sheriff should then summon a jury to try the right of property, and had the slaves at the place of delivery, on the day fixed, in due and proper time, and offered to deliver them, and requested the sheriff to summon a jury to try the right of property, but was put off from time to time by him, and eventually was prevented from delivering them, by a determination on the part of the sheriff, to postpone the sale until the first day of the next County Court, and an agreement with him to come to town on the next day, or a few days thereafter, and execute a new delivery bond. That he came in as promised, and was astonished to find that the sheriff had returned the bond forfeited, and taken out a new execution on it, against him, for the whole amount of the debt.
He further charges that, the sheriff, after having returned several executions on the judgment against Thomas Hagan, “no property found,” was directed by the agent of Tobin, to levy the execution on the said slaves, the property of the complainant. And that, by the fraud and combination of the sheriff, To-bin, and his agent, he had been involved in the difficulty. He tendered himself yet willing and ready to *266 submit to a trial of the right of property by a jury, and prays relief against the execution, &c.
Altho’ a court of law may protect and relieve any party from injury by an abuse of its process — yet, hold, that a sheriff having returned an ex’on with a delivery bond, and false return, that the obligors had failed to produce the property as required by the bond, and having thereby fraudulently exposed the debtor and his surety to an ex’on (under the act of 1828,) for the amount of the debt — a court of eq. may take jurisdiction of a bill filed by a surety, and afford him relief against the effect of the false return. As to the nature & extent of the relief, vide post, 268.
Suggestion that where an ex’on against one man is levied on another’s property —which is sold, and the proceeds paid to the plaintiff, the owner of the property may waive the trespass, and, by bill in chancery, or by assumpsit, may recover of the pl’tff in the ex’on, the money received by him.
*266 Tobin answered, professing his ignorance of the matters alleged, insisting upon the liability of the slaves to his execution, and upon the enforcement of the bond of delivery, &c.
The Circuit Court dissolved the complainant’s injunction, with ten per cent, damages and costs, and dismissed his bill. From which he has appealed to this Court.
Though it might be competent for a court of law, whose process has been abused, to afford relief by quashing the bond and the return of its officer; yet if the facts charged be true, they exhibit so strong a case of trick, stratagem, fraud and oppression, that we cannot doubt the power of the Chancellor to interfere.
There are numerous cases in which a court of chancery exercises concurrent jurisdiction with a court of law, in affording relief; as in the case of partial payments, or payments after a bond falls due, or payments after judgment, fraud, &c. &c. It may also, and does often, interpose to relieve against a penalty.
If the bond in this case were executory, or not made to possess the force of a judgment, and the complainant had been seduced into its execution, to relieve his own property, which was not subject to the execution, from the fangs of the sheriff, we could not doubt that the Chancellor could interpose, not only to relieve him from its penalty, but from the whole bond. And we cannot perceive how it can be exempted from his scrutiny, by being elevated to the dignity of a judgment, by the fraudulent act of the sheriff.
Indeed, a judgment, though sanctified by the most solemn action of a common law court, may be impeached in chancery, if vitiated by fraud. And we know of no principle, which would place a bond, which is made to have the force of a judgment by the stratagem or fraud of a mere ministerial officer, upon higher ground than the solemn determination of a judicial tribunal.
If the slaves had been sold, and the money paid over to the plaintiff, in a proceeding against him by the right *267 ful owner, it is believed he would be treated by the Chancellor, as holding the money for the use of the rightful owner of the property, or in trust for his benefit, if he should choose to waive the trespass for taking the property, and go against him in chancery for the money, the proceeds of the sale, or in assumpsit at law. If so, we can perceive no principle of law, or rule of reason, especially under the peculiar circumstances of this case, to prevent the Chancellor from interposing, to arrest proceedings upon a bond forfeited for failing to deliver property not subject to the execution, but wrongfully seized by the sheriff by color thereof.
Evidence,-
Again, the statute of 1828, on the subject of delivery bonds, is highly penal in its operation. It subjects the surety who undertakes, not only to the value of the property, which is not delivered, but to the payment of the whole judgment. If, therefore, he is seduced into its execution to relieve his own property from wrongful distress, and afterwards by casualty, trick, or fraud is prevented from delivering the property, and subjected not only to its value, but to a liability to pay the whole judgment, though double or quadruple its value, it seems to present a case of hardship and oppression, which addresses itself peculiarly to a court of conscience for relief.
A scrutinizing examination of the testimony, has convinced us that there is a clear preponderance in support of the facts charged in the bill.
Several witnesses prove, that they saw the slaves at the court house on the day designated in the bond for their delivery. And one witness, of respectability and intelligence, proves dictinctly and unequivocally,- that he was employed by the complainant, as his attorney,to attend the trial of the right of property, and that the slaves were there, and were tendered to the sheriff, and a jury demanded to try the right of property, several times, early and late in the day. That the sheriff put them off, declaring that he had so many other sales to make, and so much other business to attend to, that he could not attend to it; and in the evening, he proposed to postpone the trial and sale until next court, which *268 was agreed to by the complainant, who was to come in the next day, or in a few days, and renew his delivery bond; and under this agreement and understanding, the complainant went home.
The decree, to be rendered in the court below, for the relief of the complainant —its extent, conditions) &c.
He states that he had a distinct recollection of all the facts, which he details, as they were impressed on his memory from the fact of his hearing, in a few days, that the sheriff had returned the bond forfeited.
He also proves title in the plaintiff to the slaves in contest, in which he is corroborated by other witnesses.
It is true an attempt is made to disprove, by the sheriff, the material facts proven by the foregoing witness. But he is proven to be an old man, of remarkable frail memory, and there are evident marks upon the face of his deposition tending to impeach it.
He swears to support his own return, and to rescue himself from liability for its falsity. Pie must therefore be regarded as swearing under a strong bias at least, if not a direct interest. And the questions propounded to him at the commencement of his examination, were well calculated, and perhaps designedly so, to impress upon him a recollection of the responsibility of his condition, in the event of his return being falsified.
Upon the whole, strengthened and sustained as the complainant’s material witness is, by incontrovertible facts proven by other witnesses, we cannot doubt that all the material facts charged in the bill, have been made out in proof.
Under this conviction, we are constrained to afford some relief, But what shall be the measure or character of the relief, that should be afforded, is a question of novelty, and with which we have had some difficulty.
A chancellor cannot enter the common law tribunal, and quash the bond. He can only act upon the plaintiff in execution, by restraining him from suing out or using his execution against the complainant And it may be contended, that by suing out execution against one of the obligors in the bond, his execution may be subjected to a liability to be quashed by the common law judge. And though he ought not to use it against the *269 complainant, he should be permitted to use it against Thomas Hagan, the principal.
He would not be guilty of a violation of the injunction by suing it out against both, provided he would endorse it, not to be executed upon the property of the complainant. Again: if any difficulty was likely to accrue by proceeding on the bond, he would have a right, upon motion, to procure the bond to be quashed, which would leave him to his remedy upon his original judgment.
But the complainant proffers in his bill to have the slaves forthcoming, to submit to a trial of the right of property. And as it was a part of the terms upon which he was permitted to go home with the slaves, that he should come to town, in a few days, and enter into a new delivery bond, it seems proper that he, as complainant seeking equitable relief, should yet submit to the terms, as near as may be, upon which the slaves were intrusted to his custody.
And though no execution could now issue upon which a proceeding to try the right of property could legally take place, and if it could, though the Chancellor might restrain, he could not perhaps coerce the action of the common law tribunal, or of its ministerial officer, yet he possesses the power to direct an issue to try the right of property, so as to give to the plaintiff all the benefit of a full and fair investigation before a jury.
And, though the complainant’s right to the slaves seems to be pretty well made out, in the absence of any opposing testimony: yet as the plaintiff in the execution seems to have relied upon the delivery bond, and its obligatory force, and seems not to have directed his attention to Thomas Hagan’s right of property in the slaves, or to their liability to his execution, and as the complainant proffers a submission to a trial by jury, and the decree of the Circuit Court will have to be reversed, we have concluded that proceeding should be directed, which the Chancellor should have pursued when the case was before him.
It is therefore the opinion of this Court, that the decree of the Circuit Court be reversed, and the cause re *270 manded, that the chancellor may direct an issue to a jury, to try whether the slaves were the property of Leonard Hagan at the time of the levy, or whether they were subject to the execution; also, to ascertain their value at that time. And if they shall be found to have been subject to the execution, that the complainant deliver them to the order of the Chancellor, to be sold by a commissioner, who may be appointed for that purpose; the sale to be made on a credit of three months, and bond and surety to be taken to the plaintiff at law, for the price they shall command — to have the force and effect of a sale bond at law; and upon which an execution may issue, and if the slaves shall not be surrendered, that their assessed value be paid to the plaintiff below. And upon the delivery and sale of the slaves, as aforesaid, or payment of their value, that the amount be credited on the delivery bond, and a perpetual injunction decreed in favor of the complainant, against the residue of the bond. But in- case the slaves shall be found to have been the property of the complainant, and not subject to the execution, that then a perpetual injunction be granted the complainant against all further proceedings against him, upon the bond; and that his costs be decreed him in the Circuit Court, and in this Court. But it is to be understood, as the complainant was not in default for failing to deliver the slaves to the sheriff, he is not to be responsible for their value, in case they., in the mean time, have died.