Judge Marshall
delivered the Opinion of the Court.
This-bill was filed by John Laughlin, to enjoin perpetually the enforcement against him of a forthcoming bond, executed by h.im, as the surety of George Snyder; for the delivery of a negro woman and her infant child, taken in execution as the property of Snyder, under a judgment of the Clarke Circuit Court, in favor of Ferguson.
Besides other allegations, which, being denied and not sustained by the slightest proof, need not be stated, the bill alleges, that the negroes were not the property of, Snyder, nor subject to the execution, but that .they belonged to one John Grimes, who had bought' them from, and then hired them to, a certain Samuel Smedley, by whom they were hired to Snyder; that Snyder had them in possession merely on hire when the execution was levied and the delivery bond taken; and that, the term of. hire having expired between the date and maturity of the bond, Grimes had -taken them to his own house in another county, so that they could not be delivered according to the requisitions of the bond; that an execution on the bond had been levied on the complainant’s property; and that Snyder being entirely insolvent, so that he could not be made to refund, &c. the complainant was without remedy at law, and only relievable in equity. -
By an amended bill, Grimes and Smedley are made defendants, and the complainant — alleging that the negroes were taken out of Snyder’s possession, and beyond the jurisdictional limits of the Court, by the combined action of Snyder, Grimes and Smedley, without his knowledge or consent, and when they knew of the *112 levy, and of his having become bound for their delivery on the appointed day of sale — prays that, if the negroes should be determined to have been subject to the execution, and the injunction be dissolved, he may have a decree over against these defendants.
Answers.
Injunction dissolved; bill dismissed, and appeal.
There are cases in which a court of equity will interpose in behalf of a surety in a forthcoming bond, and, by injunction, relieve him from the consequences of a forfeiture — as in the cases in 5 Dane, where the delivery was ■prevented, in one case by the evasions of the sheriff; in another by the refusal of the sheriff, under, a misconception of his duty, to receive the property when it was tendered to him. But when an execution has been levied on property which does not belong to the def’t, and a delivery bond has been given for it, which is forfeited in consequence of the property being reclaimed and removed by the true owner, 'it seems a court of equity cannot take jurisdiction, to relieve the surety; because he has an adequate remedy at law — by a quash al of the leyy & bond.
*112 The knowledge and combination thus charged upon them, are not denied; but they insist that the negroes were the property of Grimes, ánd not subject to the execution, and that their removal from Snyder’s possession was rightful.
Ferguson, the creditor under whose execution the seizure was made, contends that the negroes were subject to levy and sale for the satisfaction.of his debt.
On the hearing, the injunction was dissolved, and the bill dismissed as to all the defendants: and the complainant appeals to this Court — alleging that the Circuit Court erred, either in not perpetuating the injunction, or in not decreeing in his favor according to the prayer of the amended bill.
If the allegations of the original bill, in relation to the ownership and possession of the negroes and the causes of a non-compliance with the bond, were sustained by' the evidence, there could be no doubt that the surety ought to be relieved from the legal consequences of its breach. And the only question would be, whether he should be relieved by injunction, or by a quashal of the bond in the common law court to which it wds returned. In the cases of Hagan vs. Tobin, 5 Dana, 264, and Sadler vs. Glover, 5 Dana, 551, this Court recognized the power of the Chancellor, under certain circumstances, to relieve the surety against the enforcement of a forthcoming bond. But, in those cases, there was npt only an ability, but a bona fide attempt and offer to comply with the bond, which was frustrated, in the one case, by the evasions of the sheriff, and in the other by his refusal, under a mistaken sense of duty, to receive the property. And as the jurisdiction, as recognized in those cases, should perhaps be considered as properly founded on these peculiar circumstances — we do- not regard them as direct authority for the interposition of a court of equity in the present case, in which, upon the facts *113 assumed,- the circumstances relied- oh to excuse the ■breach of the bond, go equally to show that the seizure of the property was illegal, and that therefore the bond itself, which was founded upon thát seizure, was taken without the authority of law, and ought not to be enforced as a legal instrument. The injustice, of enforcing such a bond against an innocent surety, is doubtless a sufficient ground for proceeding in equity, if there be no legal remedy. But as the questions arising on the facts seem to be of a purely legal character, affecting the validity of the bond, we are not prepared to admit that the surety may not, generally, find prompt and adequate relief at law, in a quashal of the bond itself; and are, therefore, not prepared to admit, that a bill founded merely upon the naked facts referred to, should be entertained in a court of equity. For this is obviously one of that class of cases in which 'the existence of an adequate legal remedy should constitute a sufficient objection to the .assumption of jurisdiction by the Chancellor.
The fact that the fivery^ond.^urrendered the takenTto persons who removed them hey0ndhis control, principal orsurety. for their non-delivery.
We do not, however, deem it necessary to decide the question of jurisdiction in this case; because, from a consideration of the evidence, we have been brought to the conclusion, that the negroes in question were subject to the execution of Ferguson. There was, there-r i x* jc n i*i u fore, a proper foundation tor the bond; which was obligatory both in law and equity. And the fact that Snyder surrendered the negroes to other partied, who so disposed of them that thev could not be delivered by him or his surety — though it may account for their nondelivery — furnishes no excuse for -it, either to the principal or his surety. It is hot, indeed, contended,'nor could it be with any show of reason; that, if the negroes were liable to the execution, their removal, by the act or consent of Snyder, presents any ground for relieving the surety from the legal consequences of a breach Of the bond/ But it is strenuously maintained in argument, that the negroes were, in good - faith, the property of Grimes, as alleged in the bill, and were not liable to the execution against Snyder. And as this is the'important point in the case, it seems proper to advert with some *114 particularity to the facts, and to the grounds of the conclusion at -which we have arrived.
Though a bill of sale of slaves imade by an agent in his own-name, could not, of itself pass the title, (which was not in him;) yet "the sale being made to a creditor of the owner, with the owner’s concurrence, and with that also, of a mortgagee, who consented to the sale upon the agent's assurance that 'bis debt should he paid— the sale passed a valid title, as against the own>er and mortga-gee; and which would havebeen valid against all the world, if there had been a delivery of the slaves, or if the delivery was not indispensable. But — • ^Upon a sale of slaves, or other chattels, the purchaser must take and hold the possession; for, if the vendor is permitted to retain it, or it is immediately redelivered to him, the sale is fraudulent and void as to creditors and subsequent purchasers; and no agreement between the purchaser and,vendor, by which the latter is to retain the possession, upon hire or otherwise, however fair; no intervention of any third party, will-prevent the application of the rule. So, where a sale was made as above stated, and the purchaser agreed with-the agent, that he might take the slaves, keep-them a certain, time,and then repurchase them, paying hire for the interim, and-the agent, without the consent or knowledge of the purchaser, hired them to-his principal, the vendor, so that there was, in-fact, no actual change of the possession, until another credL itor of the vendor levied an execution upon them — it is held that — the possession so retained; by the vendor— the sale must be deemed void as to creditors and purchasers, and the slaves subject to the execution,
*114 It is admitted, as well as proved, that, up to June, 1834, Snyder, then a merchant in the town of Paris, was the owner of the negroes; and that, being considerably indebted and embarrassed in his circumstances, he made two mortgages, in the early part of that month —the first to Samuel Smedley, and the second to John L. Hickman. The two together covered all his property'; the last included the two negroes. At the succeeding August term of the Bourbon Circuit Court, Grimes obtained two judgments against Snyder, for upwards of eight hundred dollars, on which executions were immediately issued and placed in the hands of the sheriff, who was repeatedly urged by him to -levy on the mortgaged property. But, on the. 2d day of September, before any levy had been made, Smedley, the principal creditor and mortgagee, who, under authority from Snyder, had undertaken to manage the mortgaged property so as to pay as much as possible of Snyder’s debts, reserving an, indemnity for himself and Hickman, after repeated unsuccessful negotiations with Grimes, affected an arrangement with him, by which he agreed to lose fifty dollars of his debt, to take the two negroes in question, at four hundred dollars, and to receive the balance in notes, the proceeds of Snyder’s property. For the effectuation of this arrangement, Hickman agreed, verbally, to release the negroes then in Snyder’s possession, upon Smedley’s undertaking to secure him'against loss. Whereupon Smedley, with the consent of Hickman and Snyder, and probably in their presence, executed, in his own name, an absolute bill of sale to Grimes; who, at the same time, and in pursuance of a previous agreement, executed to Smedley a writing stating that he had hired the negroes to him until Christmas, for ten dollars, and further agreeing to sell them to him, upon his paying four hundred dollars, between the date, and Christmas, and that, if he purchased and. paid that sum, no hire was to be charged.
Although, when these writings were executed, Smedley had no' pretence of title to the negroes, and his bill *115 of sale, therefore, conveyed no'ne, propria vigore, yet, as it wás made upon a valuable consideration, and with the assent and co-operation of Hickman and Snyder, for the direct benefit of the latter, and upon a promise of indemnity to the fomier, there can be no question that it operated as against them, to invest Grimes absolutely with the entire right and ownership of the slaves. And it was equally effectual against all the world, if, in point of fact, the possession, as is contended, accompanied this transfer of title, or if, as is also contended, there was no necessity, under the circumstances, that the possession should be transferred.
With regard to the matter of fact — it is entirely clear that, notwithstanding the bill of sale, the negroes remained in the actual possession of Snyder, until, after having been removed with his family to the county of Clarke, they were there seized by the sheriff, under Ferguson’s execution, on the 11th day of December, 1834; and having been then left in Snyder’s possession, in consequence of the forth coming bond, they so contmued.until Christmas'(1834,) when Grimes, with the assent of Snyder, removed them to his own house in the county of Bourbon; where he was soon met by Smedley,. who paid him the four hundred dollars, and .had the woman conveyed to.Louisville, and sold for five hundred and eighty seven dollars. The child remained with Grimes, in consequence of sickness, of which it soon after died. Grimes states in his deposition, that in the morning of the day on which the writings were executed,, the negro woman was shown to him, and he was told to take her, but he did not do it. He also states that he.refused to hire her to Snyder, and that, upon the execution of the writings, he directed and expected Smedley to take possession of her, she being immediately on his way home. Smedley says he hired her to Snyder; but that, as she had been mortgaged, and not sold, to Hickman, an immediate change of the possession was not deemed necessary. ■
There was not then even a momentary ,change of the-possession in fact; and the double hiring, by Grimes to Smedley, and by him to Snyder, which as between these *116 parties, secured the possession to the latter for a fixed period, although it placed Snyder in the condition of holding possession for Grimes, and acknowledging his right to it, did not differ, in this respect, from a loan, or a tacit or express permission that Snyder might retain the use of the negroes after, and notwithstanding, the absolute transfer of his title to Grimes. In the case of Goldsbury vs. May, 1 Litt. Rep. 256, it is decided that, if an absolute purchaser, for a valuable consideration, after receiving the possession, immediately restore it to the vendor by way of loan, it is a fraud per se; and in the case of Grimes vs. Davis, ib. 242, and that of Hundley vs. Webb, 3 J. J. Marshall, 643 — in each of which cases the bill of sale stated that the slave was to be delivered to the vendee when called for — the sales were pronounced to be per se fraudulent and void as to creditors and subsequent purchasers, on the ground that the possession did not accompany and follow the title. And yet, in the first of these cases there was a temporary union in fact of the title and possession, and in each of them there was, as substantially as in the present case, a union of the constructive possession with the apparent title. In these cases, and in that of Dale vs. Arnold, 2 Bibb, 605, the possession remained with the vendors-, and, on the assumption that Smedley was the vendor in this case, it might be said! that the possession did not remain with him. But, without stopping to notice, with a view to this distinction, the fact that the negroes were in the first instance hired to Smedley, and he was expected to take possession of them, it is manifest, as already intimated, that although the title passed by Smedley’s bill of sale, Snyder, and not he, was the real owner. And this ^ must have been well known to Grimes, who could have regarded Smedley in no other light than as the trustee or confidential agent of Snyder, and as acting for his benefit in selling the negroes, in hiring them from the vendee, and in securing the privilege of repurchase. The requisition — well established by the cases above referred to, and others decided by tribunals of the highest resort — that in case of an absolute sale, ‘possession must accompany and follow the deed,’ or the transaction will *117 be void as to creditors and purchasers, would be of no . avail if its application could be evaded by the infcroduction of a third person, as nominal vendor, while the possession remains with the beneficial owner, who is a debtor. A reasonable regard for, the rule and for the policy on which it is founded, requires that, in such a case, the same principles should be applied as if the beneficiary were the nominal vendor. And this, in effect, is declared to be the law in the case of Breckinridge vs. Anderson, 3 J. J. Marshall, 713-14.
In the same case (page 714,) the doctrine is asserted, and it seems entirely reasonable, that the vendee, having acquired the possession under íiis purchase, must have enjoyed it so as to show that the delivery to him was not merely formal or colorable, before he can safely transfer it to one who was concerned in the contract of sale. In the annunciation of this doctrine, no exception .is made of the case in which the re-transfer of the possession by the vendee to the vendor, may be under a contract of hire. Nor do we perceive any ground, consistent with the objects of the rule, on which to place an exception in the case of a hiring, which would not apply with equal force to the case of a loan and every other bailment, and therefore, to every case in which the vendor retains, or immediately re-acqüires, the possession with the assent of the vendee. • The form in which this assent may be expressed, and the inducement to it, are alike immaterial. The fact that, notwithstanding an absolute deed transferring the title, the visible possession and substantial use of the thing sold remain with the former owner, is, in judgment of law, conclusive evidence of fraud as to creditors and purchasers; and as, under this inexorable judgment, neither the existence of a valuable consideration, nor of an actual intention to sell, can be proved with the effect of redeeming the sale from condemnation for legal fraud (Goldsbury vs. May, and Hundley vs. Webb, ubi supra;) so the fact, that the vendor’s possession is held under a contract of hiring, even if actual payment were secured, since this fact does not change the state of the possession, but only tends to prove the fairness of the original sale, must be *118 equally ineffectual. As to the possession itself, the vendee does not gain or retain it, any more by a hiring, though real, than by a real or bom fide loan.
The principle that makes an absolute sale void as to creditors and purchasers when the possession remains with the vendor, applies only to purchases by con tract with the owner: not to sales under execution. ButAeMj that the fact, that the purchaser was a judg t creditor of the vendor, and had an execution in the hands of the officer binding the property, which was received in part satisfaction of the debt — as the sale was still hut the private act of the parties — is not sufficient to bring the case within the exception; which results from the openness and fairness with which judicial sales, by public officers, are presumed to be made.
In the present case, however, there was no actual payment of hire, and not even an absolute promise to pay; but the obligation to pay was dependent upon the failure of Smedley to re-purchase the negroes, on terms considered by him as highly advantageous, and which turned out to be*so. And to decide that the hiring, in in this case, was either equivalent to an actual possession on the part of the vendee, or dispensed with it, would, in our opinion, be a virtual abrogation of the rule to which we have adverted.
But it has been settled by repeated decisions of this Court, that the principle which avoids an absolute sale unaccompanied by the possession, as fraudulent per se with respect to creditors and purchasers, applies only to sales by private, voluntary contract, and not to coercive sales made under execution. Greathouse vs. Brown, 5 Mon. 282; Kilby vs. Haggin, 3 J. J. Marshall, 213; Hundley vs. Webb, Ib. 653-4; Breckinridge vs. Anderson, Ib. 713. And it is contended that, as this sale was made in discharge of a debt due by Snyder, for the coercion of which an execution, which bound his right to the property, was actually in the sheriff’s hands, it is to be considered as in the nature of a coercive sale; that, being an effectuation of the object of the law by act of the parties, it is entitled to the same regard as if made by the officer of the law, and that for these and other similar reasons, it should, like an actually coercive sale by the sheriff, be exempt from the application of the principle stated. But whatever analogy may be supposed to exist, in some respects, between this sale and one made by the sheriff under execution, it will be found, upon examination of the cases just cited, that their is no analogy whatever with regard to those circumstances, belonging to a sale under execution, which form the chief ground of excepting it from the general principle.
In the case of Greathouse, &c. vs. Brown, (5 Mon. 282,) the only one of these cited in which the grounds of discrimination between the class of sales to which the *119 principle does, and that to which it does not, apply, are at all'set forth, the Court say — “It.cannot be admitted, as a legal proposition, that a purchase at public auction from an officer of the law, fairly and openly made, is rendered null and fraudulent, because the purchaser leaves the property, in the possession of. the former owner. Such'an open public purchase and transfer of property, does not come within the reason of the case of Hamilton vs. Russell (1 Cranch, 309,) and the. cases decided upon private sales between vendor and vendee.— The publicity of the transaction divests it of its tendency to decieve others,” &c. In the other cases, the distinction is merely stated as being well established between ‘private’ sales, which are in some instances chai-acterized by the additional epithet of ‘voluntary,’ and ‘sales under execution,’ which are sometimes characterized in addition as ‘coercive.’
No inference can properly be founded upon this apparently casual use of these terms which are obviously intended — hot to point out any new grounds of distinction — but merely to refer to those which had been previously settled.
The true distinction established by the cases, is between a sale made by the vendor or his individual agent, which, in the absence of physical.coercion, is properly a voluntary as well as a private sale, and one made under a legal madate and by the officer of the law, and which is, therefore, properly a coercive sale. And it is because a sale of the latter class 'is made under command of the law, and not under the mere will of the owner; by the act of the law, through its officer, and not by the individual act of the par.ty or his agent, and with that fairness and publicity which the law requires and expects from its officer, and not merely before such witnesses as the owner may provide — -that the law so far confides in it, as not to pronounce it conclusively void upon the mere fact that the possession remains with the former owner — although this fact may be a badge or evidence of fraud even in a sale under execution.
The sale to Grimes being the private, voluntary act of the vendor — though made for the satisfaction of an *120 urgent debt — must fall within the general principle, and become void as to creditors, by the fact that the possession remained with the former owner.
A contract allowing vendor chase, and havingreducing absolute sale to a mortgage the conveyance corded with it, to save the trans action from the legal consequences of permitting remain in the vendor after the sale.
A mortgagee, on mise Of themortgagor’s agent, to from loss, Consent” verbally, to á the mortgage property: the sale movt|ttgíeSthus far, & the prop-in the possession of the mortgage cannot afterwards be used to defeat a levy upon it.
It has not been contended in argument, that the sale to Grimes was not an absolute one. But it may be ProPer to remark, that even if it were conceded that the writing simultaneously executed by him could have the eh"ec^ imposing a condition upon his title, or converting the sale, as between the parties, into a mortgage; even this concession would not aid the sale as against creditors: first — because the condition was not inserted iQ the deed by which the transfer of title was evidenced; Hundley vs. Webb, 3 J. J. Marsh. 649; and, second — because, if it had been, the déed was not recorded; and wood policy dictates, and the law requires, that when the title of personal property is by contract separated Irom Ihe possession, the public, shall be notified of it by an enrollment of the contract. Flowers vs. Sproule, 2 Marsh. 57. But we are of opinion that the writing from Grimes to Smedley, was but a covenant to sell, or, at most, was a conditional sale, and had no effect upon the previous sale to Grimes.
With regard to the mortgage to Hickman: we are of up that it was extinguished, so far as relates to the negroes in question, by the sale and transfer to Grimes, under the circumstances which have been stated. It could not, therefore, either justify the continuance of possession in Snyder, as seems to have been supposed by Smedley; nor — although the mortgage deed was duly recorded — could it protect the negroes from any execution against Snyder. The very object and intent of Hickman’s verbal release, or agreement to release, was to enable Smedley, acting in reality for Snyder, to invest Grimes with the absolute title. This was fully ac-comphshed by the bill of sale to Grimes, upon valuable consideration. And the mortgage title did not in fact subsist as an independent one for a moment afterwards. Nor was there in the transaction itself any ground on which a Court of Equity could or should consider the mortgage either as not extinguished, or as capable of future resuscitation. Smedley’s undertaking to save Hick *121 man from loss, which was the consideration of Hickman’s giving up his title, was founded upon his opinion of the sufficiency of the other mortgaged property, and upon his own control over it. His object was to reheve the negroes from responsibility for the mortgage debts, and he had no right to look to the mortgage upon them as a means of indemnifying him against an undertaking which did not exist as obligatory, unless the negroes were in effect discharged from the mortgage. In no conceivable state of case, could he have been entitled to use the mortgage against Grimes, or have had any occasion for so doing. And as to Grimes, if he had taken possession of the negroes, as he should have done, he could have derived no possible advantage from the continued existence of the mortgage, either actual or supposed. And his omission to take possession, would have constituted no ground for raising up the fiction of a continuance of the mortgage, even if there had been no other means of saving him from loss. Any loss which he might have sustained from the failure to take possession, would have been the consequence of his own neglect, which, in legal contemplation, was a fraud, and he must have abided the consequence. His title was in truth founded on the extinguishment of the mortgage, and neither he nor Smedley, who afterwards claimed under him, could have set up the mortgage to protect the negroes from the execution.
The death of a delivery bondhas been taken^will curity, when ths tondl ññt~oth~ erwise forfeited, But failure to deliver any part of the property, without surety liable for consequently the death of one of will be no ground for relief for the surety, when there is no valid excuse for the the others.
*121 We are opinion, therefore, that the negroes were subject to the execution of Ferguson, and that the forthcoming bond had a proper legal foundation. And, as the surety in that bond was especially bound for the fidelity of Snyder in keeping and producing the property for the purposes of the execution, the fact that the negroes were taken off by the combined action of Snyder with others, so far from being aground for releasing the surety, is the very contingency for which his guarantee was taken.
The death of the negro child, which occurred before the appointed day of delivery, was of course a sufficient excuse for its non-delivery; and if no other property had been covered by the bond, or if all the rest had been *122 delivered, the surety would be entitled to be relieved from the forfeiture. But as the failure to deliver a part of the property, renders the surety liable for so much of the debt as remains unsatisfied (1 Stat. Law, 642,) and as ' i v ^ere was no excuse f°r the non-delivery of the woman, the death of the child does not entitle him to relief to extent. Sadler vs. Glover, 5 Dana, 551-2.
A surety in a who has paid debt, has a plain remedy against the principal; hut so cipflaScontinues hound, and sub the surety has°no decree" against him. ’
The surety in a trusts'to'his principal has no interest the property specifiedinthebond; and can maintain law or fin equity, in his own name; but' when it is wrong; . withheld, the principal may sue for it, and ¿^""has’ been paid by him,may thelnteriTofthe principal. The the^bond S. of the property, ii^aHeás^none nor nny olheí surety could he substituted,
*122 It follows, that the Circuit Court did not err in dissolving the injunction, nor in dismissing the bill, so far as it seeks relief against the enforcement of the forthcoming bond; and the only remaining question is, whether the complainant should have had a decree over against Snyder, Smedley and Grimes, or any of them. With regard to Snyder, there will be a plain and simple remedy against him, so soon as the complainant has paid debt, or extinguished his liability for it. But this has not been done; the forthcoming bond is still in full force; any execution issued upon it must go against Snyder, as well as his surety, and although it is highly probable that the debt will be coerced from the surety, an(* although this probability might,if his assumption of it had extinguished Snyder’s liability, entitle him to a judgment or decree for reimbursement — he can have no claim for reimbursement while Snyder is still liable in the same degree as himself. And, even if he could claim an hidemnity on account of the probable loss, there is nothing of which the Chancellor could lay hold, as the means of securing him. There could, therefore, have been no decree against Snyder, on the ground of his relation as principal debtor or obligor. And we do not percieve that it was the duty of the Chancellor to have retained the bill because there might be ground for decreeing against him in that character hereafter.
A decree is, however, claimed against these parties, or some °f them, on account of their “having taken off the negroes from Snyder’s possession;” but the principie on which such a decree could be placed, has not been disclosed in argument. The complainant did not, by ... entering into the forth coming bond as surety, acquire any right or interest in'the property itself. The object of the bond was to authorize Snyder to retain the pos *123 session, and to give to the creditor, in lieu of his hold upon the property, the guarantee of the surety that their property should be delivered, or if not, that the debt should.be paid. The creditor trusts to the surety. The suretv trusts not to any lien or control over the pro- . t p , ,. p t ..... . perty, but to the fidelity of the principal m keeping and delivering it, according to the requisitions of the bond, ■ ° ’ ° * If the property be taken from the -possession of the principal against his consent, either violently or in consequence of his mere neglect, the surety can have no direct remedy, in his own, name, either in law or equity, for the property itself, or its value; much less if it be taken by the consent of the principal. In the former case, the principal, if he were the real owner, might have an action, and the surety, if by reason of the abstraetion of the property, he were compelled to pay the debt, might perhaps be substituted to this right of the principal; but if the person who- took the property had, as against the principal, a valid title to it, or if it were taken with his consent, th,ere would be no such remedy for the surety; because the principal himself would have none. Nor could he have remedy by .substitution to-the rights of the creditor; because the creditor himself,, who must take the bond in lieu of the property, has no-action either for the thing, or against the wrong-doer, and,, by the forfeiture, if not by the execution of the bond, his lien- upon the property is destroyed. It is also-to he remarked that, if there were any right of substitution in the case, it could not be enforced while the debt remained unpaid, and the-principal debtor continued Hablé for it.
There might be a ccase whete the chancellor upon the application a delivery bond would interpose removal of the ProPerty Any fraudulent combination between the principal and others, to cast a burden on the surety, might entitle him to redress from them ;.but the remedy would be at law, and if it could be had in chancery, there could ba no decree in favor of the surety, until he had paid the debt.
There might be a case in which the Chancellor would interpose to restrain the removal of the property; but no such interposition was sought in 'this case. There might also be cases of a fraudulent combination of the principal debtor and others, to subiect the surety to loss by a removal of the property, m which, after having been compelled to pay the debt, he would be entitled to *124 remuneration against the fraudulent parties. But in such a case? there would be an appropriate legal remedy; or even if the remedy were in chancery, there could be no right to remuneration, until the loss had keen actua]]y ascertained, either by payment, or at least by such an assumption of the debt as discharged the principal debtor. Whether, therefore, this be such a case or not, there could have been no decree against these parties, when this cause came to a hearing.
But the bill does not charge any fraudulent combination for the purpose of injuring the complainant. The inference from the original and amended bill, is, that, in taking possession of the negroes, Grimes was asserting, as he and the complainant also believed, his legal right of ownership — the assertion of which, as they supposed, would protect the complainant from loss, instead of subjecting him to it. We are of opinion, therefore, that the complainant has not shown that he is, or will be, entitled to any relief against,Grimes or Snyder; or that he could have had any decree against Smedley, at the hearing; or that there was any ground for retaining the bill as to him, after going into a full hearing without objection.
Wherefore, the decree is affirmed.